**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

SHANNON R. O'NEAL                               :                    Case No. 5:11 CV 2673

                        Plaintiff,                      :

v.                                                              :

COMMISSIONER OF SOCIAL SECURITY, :                    **MAGISTRATE'S REPORT AND
                                                                        RECOMMENDATION**

                        Defendant.                    :

**I. INTRODUCTION.**

In accordance with the provisions of 28 U. S. C. § 636(c) and UNITED STATES DISTRICT

COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULE 72.2, this case was referred to the

undersigned Magistrate Judge for a Report and Recommendation as provided in LOCAL RULE 72.1.

In this lawsuit filed pursuant to 42 U. S. C. §§ 405(g), Plaintiff seeks judicial review of Defendant's

final determination denying her claims for disability insurance benefits (DIB) under Title II of the

Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income

(SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq.*  The issues before the Court are

presented in a Motion for Summary Judgment and Brief filed by Plaintiff, the Brief on the Merits

filed by the Commissioner and Plaintiff's Reply[1] (Docket Nos. 11, 12, 13 & 14).  For the reasons that follow, the Magistrate Judge recommends that the Court affirm the Commissioner's decision.

## II. FACTUAL & PROCEDURAL BACKGROUNDS.

Plaintiff filed two applications for benefits, one for SSI and the other for DIB.  Both were filed on April 3, 2008 and both applications alleged that Plaintiff became unable to work because of her disabling condition on January 10, 2007 (Docket No. 9, pp. 168-172 of 707).  Following initial and reconsideration denials of her claims, Plaintiff requested a hearing.  An administrative hearing was conducted on November 19, 2010 in Akron, Ohio, and on January 3, 2011, Administrative Law Judge (ALJ) Dwight D. Wilkerson determined that Plaintiff was neither entitled to a period of disability nor eligible for SSI (Docket No. 9, pp. 32-47, 56, 104, 136-144, 152-154 of 707).  The Appeals Council denied Plaintiff's request for review on October 11, 2011 (Docket No. 9, pp. 12-14 of 707).

### 1. THE ADMINISTRATIVE HEARING.

At the administrative hearing, Plaintiff appeared in person, with counsel, and testified.  Testimony was given by Lynne E. Kaufmann, a Vocational Expert (VE) and Joseph M. Steiner, a Medical Expert (ME), by telephonic means.  Also present was Katy Martineau, a case manager, who was observing the proceedings (Docket No. 9, pp. 56-59 of 707).

### A. PLAINTIFF'S TESTIMONY.

Plaintiff, a 48-year old high school graduate, is a certified cosmetologist who resided in an

---

[1]

Under the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES 72.2, the Motion for Summary Judgment is considered a petition for review of administrative decision.  The Magistrate Judge does not analyze this case under the summary judgment standard.

apartment with her boyfriend, Mark, and her minor son.  Their financial support was derived from her boyfriend's social security income (Docket No. 9, pp. 61-63 of 707).

Plaintiff did not have an extensive employment history.  Plaintiff abandoned her nine-month employment as a cosmetologist when her wages failed to cover child care costs.  While working at a McDonalds restaurant, Plaintiff mastered the tasks of making french fries but she quit when promoted to cashier.  She got panicky, frustrated and anxious while attempting to service crowds of unfamiliar people expeditiously.  Attempts at retraining were unsuccessful so Plaintiff resigned (Docket No. 9, pp. 63-65, 66-67 of 707).

Now, Plaintiff suggested that she could not work because of impairments which included shattered leg bones, anxiety attacks, depression and asthma.  In 1991, Plaintiff shattered the bones in her leg.  She had a screw through her ankle and a plate in her leg.  The pain in her leg was exacerbated by cold.  She could bend her foot on her left side but not her right.  The pain inhibited her ability to walk.  Plaintiff took Vicodin for the pain (Docket No. 9, p. 76 of 707).

Plaintiff suffered from symptoms of depression daily, including occasional crying, anger and changes in appetite.  Plaintiff recounted that while incarcerated, her treatment for depression with drug therapy and counseling continued.  Upon her release from prison, Plaintiff commenced treating with Kevin Coleman for "mental things."  Recently new medication was incorporated into her regimen.  Even with this new medication, Plaintiff continued to have panic attacks precipitated by being around people, auditory hallucination up to seven times daily and episodes of paranoia (Docket No. 9, pp. 67-69, 74-75, 80 of 707).

To treat the symptoms of asthma, Plaintiff was prescribed a bronchodilator to relax muscles in the airways and increase air flow to the lungs.  Plaintiff noticed that she had difficulty breathing

when she used too much physical energy or panicked (Docket No. 9, p. 77 of 707).

The side effects of Plaintiff's medications that included nausea, vomiting and fatigue. Once, Plaintiff even noticed a rash. She admitted, however, that during the three months preceding the hearing, the side effects dissipated. Not necessarily attributed to the medication, Plaintiff also had problems with her memory and her ability to narrow her focus for extended periods of time (Docket No. 9, pp. 78, 79, 80 of 707).

During a typical day, Plaintiff was awakened by her boyfriend, Mark, at 7:00 A.M.. He prepared breakfast, organized her medications, selected her clothing and cooked lunch. On the day preceding the hearing, Plaintiff and Mark walked a mile. As an aside, Plaintiff mentioned that while walking, she suspected that the drivers were talking about her. When she returned from the walk, Plaintiff played with her dog and prepared the water for cleaning the dishes. She talked to Mark and made sandwiches while Mark cleaned the dishes. Plaintiff explained that she was not a captive audience for television since she could not sit very long. On three to five days per week, Plaintiff took a nap after lunch that lasted fifteen minutes or more. Soon after dinner was served, Plaintiff took her medication which brought on drowsiness. Normally in bed by 8:00 P.M., Plaintiff's sleep was generally disturbed by dreams or hearing someone stirring about in the kitchen (Docket No. 9, pp. 70-72, 81 of 707).

Plaintiff admitted that she started using marijuana in high school because of its relaxing properties. Plaintiff claimed that she stopped using cocaine almost eight months earlier and that she no longer drank alcohol (Docket No. 9, pp. 73-74 of 707).

**B.     THE ME'S TESTIMONY.**

A licensed clinical psychologist, the ME opined that there was sufficient evidence in the

4

record for him to have an opinion as to Plaintiff's medical status.  Based on his education, experience, training and review of the medical record, the medically determinable impairments that Plaintiff had during the period of twelve months or more since the protective filing date, were a bipolar disorder, generalized anxiety disorder, cocaine and cannabis dependence, a panic disorder without agoraphobia and anxiety disorder, not otherwise specified.  The ME explained that Plaintiff met 12.04 of the Listing beginning in January 2009[2].  In fact, looking at her functioning for the past eight months, Plaintiff met the Listing.  The basis of this opinion was that her diagnoses were consistent throughout the years and very severe, supported by marked functioning and socialization and "CPP" in concentration, persistence and pace.  When asked if Plaintiff would meet the listing if the effects of drug and alcohol abuse were excluded from consideration, the ME was unable to provide a response.  The ME opined that when referring to job duties, Plaintiff should have simple, routine tasks without a lot of pressure.  In other words, Plaintiff should be able to work without very close mini-management, very limited or no quotas and have already simple, superficial social contact (Docket No. 9, pp. 83-91 of 707).

The ME noted that the medical exhibits showed that Plaintiff was socially withdrawn, hostile and all the functional limitations were moderately impaired, that she was described as paranoid and her anxiety was in paralysis support, that she panicked in crowds and she had a moderate level of social problems with the public and was criticized by coworkers.  Based on Plaintiff's testimony that she had not used drugs or alcohol during the last eight months, she would meet the Listing and her

---

[2]

12.04 Affective disorders:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

functional imitations would be limited to simple, routine tasks without a lot of pressure, very limited or no quotas and simple superficial social contact (Docket No. 9, pp. 90-91 of 707).

In response to counsel's question if the date of disability was extended back to January 2007, the ME stated that although he was confused by the substance abuse, he had to say overall that his opinion would be the same regarding the essential meeting of Listing 12.04 (Docket No. 8, p. 91 of 707).

C.    THE VE'S TESTIMONY.

The VE reviewed Plaintiff's earning records and determined that her highest earning were $2,700.  In 1997, Plaintiff earned $2,000.  The VE concluded that Plaintiff did not have substantial work activity as the term is defined under the Act[3].

The VE explained that she used multiple publications to assist with her decisions:  the DICTIONARY OF OCCUPATIONAL TITLES (DOT), the Ohio Labor Market Information from 2009, the United Staffing report from the first quarter of 2010, Bureau of Labor Statistics' Occupational Outlook Handbook and the State of Ohio's Market/Economic Review from June 2010 (Docket No. 9, pp. 97-98 of 707).

In the <u>first hypothetical</u>, the ALJ asked the VE to assume that the hypothetical plaintiff had Plaintiff's vocational profile and was subject to the following:

(1)    ability to do light work with the exception that he or she could not climb ladders, ropes or scaffolds;
(2)    ability to perform simple routine tasks in a low-stress work setting without pressure to perform goal oriented work;

---

[3]

(a) Substantial work activity.  Substantial work activity is work activity that involves doing significant physical or mental activities.  The claimant's work may be substantial even if it is done on a part-time basis or if the claimant does less, gets paid less, or has less responsibility than when the claimant worked before.  20 C. F. R. § 220.141(a) (Thomson Reuters 2012).

(3)     ability to have only an occasional superficial interaction with others; and
(4)     necessity to refrain from concentrated exposure to pulmonary irritants, and no exposure to hazards.

(Docket No. 9, pp. 93-94, 95 of 707).

Cross-referencing these restrictions with the occupational profiles in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), the VE identified three jobs that Plaintiff could perform even with her functional limitations:

| Jobs | DOT | Number of Jobs available in the region, stateside and nationally |
|---|---|---|
| Mail sorter | 209.687-026 | 300/40,000/78,000 |
| Light packing | 559.687-074 | 000/5,000/130,000 |
| Pricer or maker | 209.587-034 | 000/2,500/70,000 |

(Docket No. 9, pp. 95-97 of 707).

In the second hypothetical, counsel added that the hypothetical worker would miss work three or more times per month.  The VE responded that the impact would be that the hypothetical worker would have difficulty sustaining or keeping the job without accommodation (Docket No. 9, p. 75 of 707).

In response to the third hypothetical, the VE explained that the hypothetical worker with the following restrictions would not be able to maintain work:

(1)     markedly limited ability to perform;
(2)     markedly limited ability to understand and remember detailed instructions,
(3)     markedly limited in carrying out those instructions, maintaining attention and concentration for extended periods and performing these activities within a schedule;
(4)     markedly limited in maintaining a regular attendance and being punctual within customary tolerances;
(5)     markedly limited in the ability to sustain ordinary routine without supervision; and
(6)     an inability to complete a normal week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

7

(Docket No. 9, pp. 98-99 of 707).

Counsel posed a <u>fourth hypothetical</u> in which he gave full credit to Plaintiff's testimony and added that the hypothetical worker would have to take unscheduled work breaks three to five times a day lasting up to thirty minutes. The VE responded that the need to be off task for such a sustained period of time would preclude the maintenance of competitive employment without a special accommodation (Docket No. 9, p. 99 of 707).

### III. THE MEDICAL EVIDENCE.

Medical evidence is the cornerstone for the determination of disability under both Title II and Title XVI. Each person who files a disability claim is responsible for providing medical evidence showing that he or she has an impairment and the severity of that impairment. 20 C. F. R. § 404.1512(c) (Thomson Reuters 2012). The medical evidence generally comes from sources that have treated or evaluated the claimant for his or her impairment. 20 C. F. R. § 404.1512(b) (Thomson Reuters 2012). A chronological review of the sources that have treated and/or evaluated Plaintiff follows.

On February 28, 2007, Plaintiff was transported by ambulance to an emergency room after family members called because she was intoxicated and sleeping. Diagnosed with acute alcohol intoxication, Plaintiff's blood alcohol level was 1.75 (a blood concentration of .08% creates a rebuttable presumption of intoxication in Ohio) (Docket No. 9, pp. 575-576 of 707).

An X-ray administered on May 7, 2007, showed a non-displaced transverse fracture of the distal third of the ulna. The fracture was set with a splint and prescription therapy was ordered. On May 11, 2007, Plaintiff presented to the emergency room for a new splint and pain medications (Docket 9, pp. 571, 577-578, 579 of 707). On May 14, 2007, Dr. Ronald C. Mineo, D. O.,

recommended a long arm cast and prescribed a pain reliever.  The cast was removed and replaced with a removable splint on July 12, 2007 (Docket No. 9, pp. 585, 586 of 707).

Upon her arrival at the penal institution, Plaintiff underwent a health screening.  The list of significant diagnoses included asthma, acid reflux and right ankle surgery (Docket No. 9, p. 436 of 707).  During the initial mental/mental health/substance use screening on October 11, 2007, Plaintiff reported that she had last used alcohol and cocaine in September 2007 and January 2007, respectively (Docket No. 9, p. 431 of 707).

A Papanicolaou test was administered on October 11, 2007.  The gynecological cytology was negative for intraepithelial lesion or malignancy.  A mammography screening was conducted on November 11, 2007.  There was no mammographic evidence of malignancy (Docket No. 9, pp. 384, 385 of 707).  On October 16, 2007, the tuberculosis skin test was administered.  The results were negative (Docket No. 9, p. 446 of 707).  Plaintiff was given the pneumococcal vaccination on December 7, 2007 (Docket No. 9, p. 447 of 707).

It was noted on December 5, 2007, that Plaintiff had not had any asthma attacks and she had been compliant with her asthma medication regimen.  In addition, Plaintiff was educated about the risks of tobacco use and encouraged to exercise (Docket No. 9, pp. 408-412 of 707).

The mental health evaluation conducted on December 29, 2007, confirmed the diagnosis of an anxiety disorder not otherwise specified made by Dr. Dilbagh Saini, M. D.  Plaintiff consented to take the recommended anti-panic/anti-anxiety medications.  She was advised that the possible side effects of this medication were drowsiness and dry mouth (Docket No. 9, pp. 391-395, 396-399, 405-407 of 707).  Plaintiff acknowledged a cocaine dependence by history.  She denied abusing street drugs during the last seven years and claimed that her dependence was in remission (Docket No. 9, pp. 418, 420, 454 of 707).

9

Laura Newberry conducted an intake assessment on January 11, 2008 for Coleman Professional Services (CPS), a non-profit behavioral health organization providing treatment for mental health.  Plaintiff self referred for treatment of symptoms related to anxiety and depression (Docket No. 9, pp. 505-506 of 707; Www.coleman-profession.com)

On January 19, 2008, Plaintiff was prescribed Trazodone, an anti-depressant (Docket No. 9, p. 415 of 707).  In contemplation of her discharge from prison, the following medications were prepared and dispensed in a two-week supply to Plaintiff on January 28, 2008:

| | | |
|---|---|---|
| (1) | Albuterol | A bronchodilator. |
| (2) | Lamictal | An anti-seizure medication. |
| (3) | Trazodone | An anti-depressant. |
| (4) | Vistaril | A sedative used to treat anxiety. |

(Docket No. 9, pp. 438-439 of 707; www.drugs.com).

When Jose Fragoso conducted a diagnostic intake assessment on February 5, 2008 for CPS, Plaintiff was homeless and reported that she had sleep and energy problems and depression and panic symptoms.  Plaintiff had suicidal ideations but she denied any homicidal ideations or intent. Plaintiff exhibited signs of a bipolar I disorder, panic disorder without agoraphobia and personality disorder.  To complicate matters, Plaintiff had occupational, economic and housing problems.  She had not used cocaine in nine months.  The evaluator subjectively determined that Plaintiff's lowest global assessment of functioning (GAF) score, a score assessing how well or adaptively an adult meets the overall level of functioning and the ability to carry out activities of daily living, was at a level which denoted behavior considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends) (Docket No. 9, pp. 470-482 of 707. Www.gafscore.com.)

10

Dr. Gina Glenn, M. D., a psychiatrist, conducted a clinical evaluation on April 15, 2008, beginning with an assessment of Plaintiff's medical, psychiatric and substance use histories. Diagnosing Plaintiff with a bipolar disorder, generalized anxiety disorder, cocaine dependence, in early remission, history of cannabis dependence and asthma, Dr. Glenn subjectively assessed Plaintiff's GAF as an improvement.  Now, the score was within the range of moderate symptoms or flat affect and circumstantial speech, occasional panic attacks or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  Dr. Glenn prescribed a trial of Lithium, a medication used to treat manic episodes of manic depression and Celexa, an antidepressant.  The prescription of Trazodone was continued and the dosages of Lamictal, an anti-seizure medication, and Vistaril, a sedative used to treat anxiety and tension, were decreased (Docket No. 9, pp. 456-458 of 707; www.healthgrades.com/physician/dr-gina-glenn; www.gafscore.com).

Dr. Peter Kontos, M. D., completed an IMPAIRMENT QUESTIONNAIRE on May 10, 2010.  He recounted that he commenced treatment on April 15, 2008, of Plaintiff's primary symptoms which included severe anxiety, a bipolar affliction, auditory hallucinations and a generalized anxiety disorder.  The clinical findings that supported his diagnosis included, *inter alia*, sleep disturbance, personality changes, substance dependence, social withdrawal and decreased energy (Docket No. 9, pp. 672-673 of 707).  It was Dr. Kontos' opinion that these symptoms resulted in markedly limited capacity to sustain the following activities over a normal workday and workweek:

    (1)      Understand and remember detailed instructions.
    (2)      Carry out detailed instructions.
    (3)      Maintain attention and concentration for extended periods.
    (4)      Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
    (5)      Sustain ordinary routine without supervision.
    (6)      Complete a normal week without interruption from psychologically based symptoms

and to perform at a consistent pace without an unreasonable number and length of rest periods.

(7)     Accept instructions and respond appropriately to criticism from supervisors.

(8)     Get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

(9)     Respond appropriately to changes in the work setting.

(10)    Travel to unfamiliar places or use public transportation.

(11)    Set realistic goals or make plans independently.

(Docket No. 9, pp. 675-677 of 707).

Dr. Catherine Flynn, Psy. D., completed the PSYCHIATRIC REVIEW TECHNIQUE form on May 17, 2008, assessing Plaintiff's medical dispositions from March 25, 2008 forward.  Dr. Flynn opined that based on medical dispositions of affective, anxiety-related, personality and substance addiction disorders, Plaintiff's degree of limitations in the following functional limitations resulted:

(1)     Restriction of activities of daily living                                    Mild
(2)     Difficulties in maintaining social functioning                       Moderate
(3)     Difficulties in maintaining concentration, persistence        Moderate
         or pace
(4)     Episodes of decompensation                                              None

(Docket No. 9, pp. 507-517 of 707).

In the MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT, Dr. Flynn rated Plaintiff's mental activity within the context of her capacity to sustain the activity over a normal workday and workweek.  She determined that Plaintiff had **moderate** limitations in her ability to:

(1)     Maintain attention and concentration for extended periods;

(2)     Sustain an ordinary routine without special supervision:

(3)     Work in coordination with or proximity to others without being distracted by them:

(4)     Complete a normal workweek and workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

(5)     Interact appropriately within the general public;

(6)     Accept instructions and respond appropriately to criticism from supervisors;

(7)     Get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

(8)     Ability to respond appropriately to changes in the work setting.

12

(Docket No. 9, pp. 521-522 of 707).

Dr. Mary-Helene Massullo conducted a consultative examination on May 27, 2008, during which she conducted a clinical interview and ordered diagnostic tests of Plaintiff's right ankle. Dr. Massullo worked with the diagnoses that Plaintiff had abused tobacco, was a drug abuser per history, had few or no teeth, had a panic disorder and history of asthma and had a history of fracture right tibia fibula with surgical intervention. The clinical and diagnostic tests confirmed that there was remote trauma involving the distal aspect of Plaintiff's leg in addition to the presence of mild osteoarthritis in the ankle; consequently, there was an abnormal range of motion in Plaintiff's ankle. However, Plaintiff could raise her shoulders, elbows, wrists and fingers against maximal resistance; her ability to grasp, manipulate, pinch and engage in fine coordination was normal; the range of motion in Plaintiff's cervical spine, shoulders, elbows, wrists and hand-fingers was normal; and the range of motion in Plaintiff's dorsolumbar spine, hips and knees was within normal parameters. Dr. Massullo opined that Plaintiff's mental status appeared normal and that Plaintiff could manage any granted benefits in her own interest (Docket No. 9, pp. 529-532, 534-537, 550 of 707).

Plaintiff presented to CPS on June 4, 2008, for purposes of monitoring her medications' efficacy and side effects. Plaintiff was disheveled, restless and hyperactive with rapid speech, racing thoughts and flights of ideas. She explained that her sleep was disrupted and her appetite was waning. Incidentally, Plaintiff showed no signs of suicidal or homicidal ideations or self injurious behavior (Docket No. 9, pp. 483-484, 565 of 707).

On August 1, 2008, Plaintiff presented to CPS. She was being evicted so Plaintiff had the added stressor of finding a residence. There was no evidence of mania, psychosis or delusions. In fact, her mood/affect had improved, her sleep and appetite upgraded to fair and her speech was less rapid (Docket No. 9, pp. 485-486, 565 of 707).

13

On October 29, 2008, Plaintiff reported to CPS that her mood was more stable although some days she experienced disruptive mood swings.  Plaintiff also denied suicidal or homicidal ideations and her current GAF denoted the presence of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)" (Docket No. 9, pp. 651-655 of 707).

Plaintiff presented to the emergency room on December 26, 2008 with complaints of falling and tripping into a hole.  Afterwards she experienced right ankle pain.  The radiological examination of Plaintiff's right ankle showed no acute bone tissue abnormality of the right leg.  A custom splint was applied and prescription therapy was given for pain (Docket No. 9, pp. 572, 573-574 of 707).

On December 29, 2009, Plaintiff reported to CPS.  Her mood was more stable although some days she experienced disruptive mood swings.  Plaintiff also denied suicidal or homicidal ideations (Docket No. 9, pp. 648-649 of 707)

On January 2, 2009, Dr. Mineo diagnosed Plaintiff with acute right ankle strain and post traumatic arthritis.  He prescribed "gentle" physical therapy for range of motion and strengthening," an air cast and a few Vicodin.  By January 23, 2009, the ankle was doing better but there was still some pain and discomfort.  Plaintiff requested more Vicodin (Docket No. 9, p. 584 of 707).

Plaintiff admitted that two days prior to the session on February 13, 2009, she had a beer.  The evaluator noted that there were conflicting accounts of how much alcohol Plaintiff consumed.  The evaluator also considered Plaintiff in early full remission for cocaine dependence (Docket No. 9, pp. 587, 597 of 707).

During her visit at CPS on February 25, 2009, Plaintiff reported that she had an apartment and was living with her son.  Plaintiff was continued on Lithium in hopes that her mood would

14

stabilize.  There was some suspicion that Plaintiff was drinking or "using" again (Docket No. 9, p. 599 of 707).

On March 25, 2009, the CPS provider noted that Plaintiff appeared to be calm and her mood was stable; however, she displayed anxiety when in a crowd.  Plaintiff's speech was normal and she denied suicidal or homicidal ideations.  Plaintiff had little racing thoughts and she was not as restless as she had been in prior meetings.  Her financial and housing stressors persisted.  Plaintiff denied "etoh" drug use (Docket No. 9, pp. 644-645 of 707)

On April 25, 2009, Dr. Alice Chambly, Psy. D., completed the MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT and the PSYCHIATRIC REVIEW TECHNIQUE for the period beginning January 27, 2009 to present.  She determined that Plaintiff had **moderate** limitations in her ability to:

(1)     Maintain attention and concentration for extended periods;
(2)     Sustain an ordinary routine without special supervision:
(3)     Complete a normal workweek and workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
(4)     Respond appropriately to changes in the work setting; and
(5)     Set realistic goals or make plans independently of others.

(Docket No. 9, pp. 602-603 of 707).

In the psychiatric review technique form, Dr. Chambly opined that Plaintiff had medically determinable impairments namely bipolar II disorder, mixed, and a generalized anxiety disorder.  Neither precisely satisfied the diagnostic criteria.  Moreover, Plaintiff was in early full remission for cocaine dependence and she had a history of cannabis abuse (Docket No. 9, pp. 606-615 of 707).

It was Dr. Chambly's opinion that Plaintiff's degree of limitations in the following functional limitations resulted:

15

| (1) | Restriction of activities of daily living | Moderate |
| (2) | Difficulties in maintaining social functioning | Mild |
| (3) | Difficulties in maintaining concentration, persistence or pace | Moderate |
| (4) | Episodes of decompensation | None |

(Docket No. 9, p. 616 of 707).

Dr. Maria Congbalay, M. D., completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY form on May 5, 2009, and determined that Plaintiff had no established communicative, visual or manipulative limitations except that Plaintiff was limited to:

(1) Occasionally lifting and/or carrying twenty pounds;
(2) Frequently lifting and/or carrying twenty ten pounds;
(3) Standing and/or walking about six hours in an eight-hour workday;
(4) Sitting about six hours in an eight-hour workday;
(5) Pushing or pulling on an unlimited basis.
(6) Never climbing using a ladder/rope/scaffold;
(7) Avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation; and
(8) Avoiding all exposure to hazards.

. Otherwise,(Docket No. 9, pp. 621-624 of 707).

Plaintiff underwent removal of an abscess on her left foot on May 26, 2009 (Docket No. 9, pp. 632-633 of 707).  Two shards were removed from the area (Docket No. 9, p. 634 of 707).

When Plaintiff reported to the CPS provider on May 29, 2009, she was calm, her mood was fair, her speech was not rapid and she denied suicidal or homicidal ideations.  She reported that she had surgery on her foot, that she was taking Vicodin and smoking "pot" (Docket No. 9, pp. 641-642 of 707).

On June 7, 2009, Dr. Anton Freihofner, M. D., determined that Plaintiff could:

(1) Occasionally lift and/or carry fifty pounds;
(2) Frequently lift and/or carry twenty five pounds;
(3) Stand and/or walk about six hours in an eight-hour workday;
(4) Sit about six hours in an eight-hour workday;
(5) Push or pull on an unlimited basis; and
(6) Occasionally climb using a ladder/rope/scaffold;

16

Dr. Freihofner suggested that Plaintiff avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation.  Otherwise, Plaintiff had no other environmental or postural limitations. Plaintiff had no communicative, manipulative or visual limitations (Docket No. 9, pp. 556-559 of 707).

Plaintiff's fiancee accompanied her to the session with the CPS provider on March 25, 2009. The examiner noted that her moods were depressed and that she exhibited tension and anxiety. Plaintiff explained that she was paranoid and her medications were no longer helpful.  The dosage of lithium was increased (Docket No. 9, pp. 665-667 of 707)

On July 24, 2009, Plaintiff reported to the CPS provider that she did not use illicit drugs but she was compliant with the prescribed drugs.  Although she reported a rash on her back, nothing was noted by the provider upon visual inspection.  There was some evidence of depression but no evidence of mania or psychosis.  Plaintiff denied suicidal or homicidal ideations, paranoia and hallucinations (Docket No. 9, pp. 635-636 of 707).

On September 9, 2009, Dr. Karla Voyten, Ph. D., conducted a case analysis, reviewing all of the evidence in the file and the MENTAL RESIDUAL FUNCTIONAL CAPACITY assessment completed by Dr. Chambly on April 25, 2009.  She affirmed Dr. Chambly's assessment as written (Docket No. 8, p. 662 of 707).

On October 16, 2009, Dr. Nick Albert, M. D., conducted a case analysis, reviewing the evidence in the file and the reports prepared by the Dr. Congbalay.  He affirmed Dr. Congbalay's report as written (Docket No. 9, p. 663 of 707).

On May 10, 2010, Plaintiff reported to CPS that she was anxious and stressed.  She did not hear voices as much but she was still restless and unable to sleep during the entire night.  Plaintiff's thought process was mildly inattentive but there was no active psychotic mentation (Docket No. 9,

17

pp. 668-669 of 707).

On August 11, 2010, Plaintiff reported to the CPS provider that she stopped taking her medications because they were not working.  She continued to have crying spells, panic and anxiety attacks and poor sleep habits.  In addition, Plaintiff was drinking more "etoh–two to three beers to a six pack" (Docket No. 9, pp. 689-690 of 707).

Similarly, on August 30, 2010, Plaintiff reported to the CPS provider that she had discontinued her medications for a week.  Her mood was somewhat better and Plaintiff was less nervous but she was still moderately anxious and in a panicked state.  Plaintiff was encouraged to continue medications.  The provider noted that Plaintiff had some weight loss and she was exercising However, she admitted to drinking three to six beers " not daily in part due to self-medication" (Docket No. 9, pp. 686-687 o f 707).

Dr. Kontos commented that Plaintiff related that she was drinking two to six beers daily and not smoking marijuana daily.  He concluded that:

> [✓] My patient's use of drugs and/or alcohol is a symptom of his condition, and/or is a form of self medication.  The disability is independent of any use.

(Docket No. 9, p. 696 of 707).

## IV. STANDARD OF DISABILITY DETERMINATION.

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively.  DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Having considered the standard of disability, medical evidence and testimony of Plaintiff, the ME and the VE, the ALJ found that:

(1)    Plaintiff had not engaged in substantial gainful activity since January 27, 2009, the application date.

(2)    Plaintiff had the following severe impairments:  asthma, dysfunction and arthritis of the right ankle, bipolar disorder, generalized anxiety disorder, panic disorder, cocaine dependence and cannabis dependence.

(3)    Plaintiff's mental impairments, including the substance use disorders, met Section 12.04 and 12.09 of 20 C. F. R. Part 404, Subpart P, Appendix 1.

(4)    If Plaintiff stopped the substance use, the remaining limitations would cause more than a minimal impact on her ability to perform basic work activities; therefore, Plaintiff could continue to have a severe impairment or combination of impairments; however, if Plaintiff stopped the substance use, she would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C. F. R. Part. 404, Subpart P, Appendix 1.

(5)    If Plaintiff stopped the substance use, she would have the residual functional capacity to perform light work as defined in 20 C. F. R. § 416.967(b), except the claimant could never use ladders, ropes, scaffolds.  In addition, Plaintiff must avoid concentrated exposure to pulmonary irritants and hazards, including uneven terrain.  Plaintiff is limited to jobs that have simple and routine tasks and are low stress with no pressure to work rapidly and no production rate paced work.  Lastly, Plaintiff should have only superficial interaction with others.

(6)    If Plaintiff stopped the substance use, considering her age, a younger individual age 18-49, who has at least a high school education and no past relevant work experience, there would be a significant number of jobs in the national economy that Plaintiff could perform.

(7)    Because Plaintiff would not be disabled if she stopped the substance use, Plaintiff's substance use disorders is a contributing factor material to the determination of disability. Thus, Plaintiff has not been disabled within the meaning of the Act at any time from the date the application was filed through the date of this decision.

(Docket No. 9, pp. 35-47 of 707).

## VI. THIS COURT'S JURISDICTION, SCOPE AND STANDARD OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g).  The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.  *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)).  The court must affirm the Commissioner's conclusions

unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . *Id.* This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

### VII. ANALYSIS.

Plaintiff claims that:

(1) The ALJ erred by finding that her substance use is material to a finding of disability under Listing 12.04.
(2) The ALJ failed to properly weigh the treating source evidence.
(3) The ALJ erred in evaluating Plaintiff's credibility.

Defendant counters with:

(1) The Act prohibits an individual disabled by substance abuse from receiving Social Security Disability Benefits.
(2) Substantial evidence supports the ALJ's decision that Plaintiff would not be disabled without her substance abuse.
(3) The ALJ followed the controlling regulations in weighting the opinion evidence against the other evidence in the record.
(4) The evidence supports the ALJ finding that Plaintiff's complaints were not entirely credible.

1.  **THE REGULATORY FRAMEWORK FOR APPLYING DRUG ADDICTION AND ALCOHOLISM AND ANALYSIS**

In the Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104–121, 110 Stat. 847, 852–53 (1996), codified at 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), Congress

amended the Social Security Act to prohibit the award of benefits to individuals for whom alcoholism or drug addiction is a contributing factor material to their disability determination. *Mathews v. Astrue*, 2011 WL 7145221, *7 (N.D.Ohio,2011) (*citing* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  The statute provides, in relevant part:

> An individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled.

> *Id.* (*citing* 42 U.S.C. §§ 423(d)(2)(C)).

The Commissioner promulgated regulations which control in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability.  20 C.F.R. §§ 404.1535, 416.935).  Those regulations provide:

> (a)  General.  If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (b)  Process we will follow when we have medical evidence of your drug addiction or alcoholism.

>> (1)  The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

>> (2)  In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

>>> (i)  If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

>>> (ii)  If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism, and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

Stated differently, under the statutes and implementing regulations if a claimant is disabled

and there is medical evidence of substance abuse, the Commissioner must determine whether the drug addiction or alcoholism is a contributing factor material to the determination of disability. *Mathews, supra*, at *7.  If it is, the claimant will be found not to be "disabled" as defined in the Act. *Id.*  A finding of disability is a condition precedent to the determination of whether drug addiction or alcoholism is a contributing factor material to the disability determination.  *Id.* (*citing* 20 C.F.R. § 416.935).  Therefore, in a case where drug addiction or alcoholism is suggested by the evidence, the ALJ must first apply the five-step sequential evaluation process to determine whether a plaintiff's limitations, including consideration of drug addiction or alcoholism, are disabling.  *Id.*  If so, the ALJ must then assess plaintiff's residual functional capacity limitations which would remain if he or she stopped using drugs or alcohol, and apply the sequential evaluation process a second time to determine whether the limitations assessed would be disabling.  *Id.*  The claimant has the burden of proving that substance abuse is not a factor material to the determination of disability.  *Davenport v. Commissioner of Social Security*, 2012 WL 414821, *10 (E.D.Mich.,2012) (*citing Trent v. Astrue*, 2011 WL 841538, *8 (N.D.Ohio,2011), *Estes v. Barnhart*, 275 F. 3d 722, 725 (8th Cir. 2002); *Brown v. Apfel*, 192 F. 3d 492, 498 (5th Cir. 1999)).

## A.  THE EFFECTS OF ALCOHOL ABUSE.

The primary factor driving Plaintiff's drug abuse and alcoholism disability determination is whether she would be disabled if she stopped using drugs or alcohol.  Plaintiff contends that the ALJ's conclusion that the limitations described in Listing 12.04 are attributed to substance abuse is not supported by the evidence.

In assessing whether Plaintiff is disabled independent of the drug abuse, the ALJ observed that there were clear periods of abstinence.  The ALJ properly looked to these periods to determine

whether Plaintiff suffered form work-limiting ailments independent of substance abuse. Specifically, the ALJ found that:

> Plaintiff was presumably drug-free while in prison in 2007.  She did not report any difficulties in daily living during the preceding seven years.  Her appearance was clean and neat and she had a GAF in the mild to moderate range.  After having been in a controlled environment, the mental health evaluators acknowledged that Plaintiff's drug and alcohol usage was only by reference to her past history (Docket No. 9, p. 40 of 707).

> Plaintiff underwent clinical evaluations on April 15, 2008 and May 27, 2008, during which the only reference to substance abuse was by past history.

There were also examples of evidence that were persuasive in determining that Plaintiff's use of substances affected her ability to function in a work environment and therefore her substance disorder was a contributing fact material to the determination of disability.

> During a session on February 13, 2009, Plaintiff had consumed a beer two days prior. Plaintiff was in early full remission for cocaine dependence.  She exhibited rapid speech, fast paced thought and anxiety and loss of appetite (Docket No. 9, pp. 587, 597 of 707).

> During her visit at CPS on February 25, 2009, the evaluator suspected that Plaintiff was drinking or using again.  She displayed feelings of anxiety and nervousness (Docket No. 9, p. 599 of 707).

> On May 29, 2009, after the surgery on her foot, Plaintiff admitted that in addition to taking Vicodin, she was self-medicating with "pot."  She denied that she was drinking (Docket No. 9, p. 641 of 707).

> On August 11, 2010, Plaintiff reported that she stopped taking the prescribed medication and she was drinking more "etoh–two to three beers to a six pack." Plaintiff was undergoing crying spells, panic and anxiety attacks and she was sleeping poorly (Docket No. 9, p. 689 of 707).

> On August 30, 2010, Plaintiff reported that she was drinking three to six beers to control her anxiety and moods and frustration.  She was less nervous but she was now fearful and avoidant (Docket No. 9, pp. 686-687 of 707).

> Plaintiff related to Dr. Kontos that she was drinking two to six beers daily and not smoking marijuana daily (Docket No. 9, p. 696 of 707).

After finding that Plaintiff had not engaged in substantial activity since January 27, 2009, the ALJ established severe impairments of asthma, dysfunction and arthritis, bipolar disorder, generalized anxiety disorder, panic disorder, cocaine and cannabis dependence.  The Appeals Council adopted the ALJ's finding that when using alcohol and/or drugs, Plaintiff meets 12.04 and 12.09 of the Listing and is disabled.  Because the medical evidence showed that Plaintiff resumed drinking and smoking drugs, the ALJ applied the sequential process a second time and made a specific findings at steps two and three that if Plaintiff stopped alcohol and drug use, her condition would not meet or medically equal any listed impairment.  The ALJ then determined whether the remaining limitations would be disabling at steps four and five of the sequential evaluation process.

At first glance, it appears that the ALJ made assumptions regarding Plaintiff's drug consumption on Plaintiff's mental and physical impairments that are without evidentiary support.  A thorough review of the decision denying disability, however, shows that the ALJ outlined the relevant applicable law for claimants with impairments connected to drug abuse and alcoholism and in that context, conducted a thorough analysis of the evidence in Plaintiff's case.  Using the standard five step approach described in 20 C. F. R. § 404.1520 without segregating the effects that might be due to substance abuse disorders, the ALJ found at step two that Plaintiff's history of drug use was a severe impairment.  The ALJ evaluated which of the current physical and mental limitations would remain if Plaintiff stopped used drugs or alcohol.  It was clear that the ALJ was making a determination regarding disability without considering the effects of Plaintiff's alcohol abuse.  Then, the ALJ determined whether any or all of Plaintiff's remaining limitations would be disabling.  The ALJ concluded that Plaintiff did not have a drug abuse-related physical or psychological impairment or combination thereof, when the substance abuse stopped.

There is substantial evidence that demonstrates that Plaintiff was afflicted with longstanding

25

drug usage, by history.  She was in early cocaine remission and she intermittently drank beer and smoked marijuana.  The evidence shows that while confined to prison from December 2007 through February 2008, Plaintiff showed symptoms of depression and anxiety but she was apparently abstinent.  There were periods of time thereafter during which she was taking drugs and/or alcohol, she occasionally stopped taking her medications and she sporadically sought treatment.

The ALJ's approach is wholly consistent with the law.  The evidence demonstrates that Plaintiff is/was a user of illicit substances, that her physical and mental impairments improve when she abstains from alcohol and complies with medical treatment, that she has failed to comply with prescribed treatment, and that alcohol abuse stands in the way of her normal functioning.  The Magistrate finds that substantial evidence on the record as a whole supports the ALJ's conclusion that alcohol was a contributing factor material to the determination of Plaintiff's disability.

### B.    ABSENT THE EFFECTS OF ALCOHOL.

Because the record contains medical evidence of alcoholism, the ALJ was required to apply the sequential evaluation process again to determine which of plaintiff's physical and mental limitations would remain if plaintiff stopped using alcohol.  The ALJ applied the sequential process a second time considering Plaintiff's limitations if she stopped using alcohol.  He then determined whether the remaining limitations would be disabling at steps four or five of the sequential evaluation process.

Plaintiff received care and treatment for her mental health conditions and her substance abuse over the course of several years, as evidenced in the record.  Several of those who treated her did so on an irregular basis and were not treating physicians, providing ongoing care over a period of time as contemplated by the regulations.  However, these professionals offered specific opinions regarding the limitations on Plaintiff's ability to work during periods of sobriety or the extent of

improvement of his symptoms during such periods.  In these cases, there was only a slight abnormality or a combination of slight abnormalities that would have an impact on Plaintiff's ability to work.

The ALJ articulated his analysis as clearly as he could.  It is apparent from his decision that he complied with the regulatory requirements, properly considering what limitations would remain if Plaintiff were drug and alcohol-free.  The Magistrate finds that the evidence before the ALJ was adequate to allow him to decide the materiality of Plaintiff's substance disorder and make a reasoned judgment of whether Plaintiff would still be disabled if she was not a substance abuser.  Remand is not warranted since there is substantial evidence in the medical record to support the ALJ's conclusions.

2.     THE TREATING SOURCE RULE AND ANALYSIS.

Plaintiff's claim is twofold:  First, the ALJ erred in attributing "little weight" to the opinions of Dr. Kontos on the basis that they were not supported by the medical record as a whole and because his opinions relied heavily on Plaintiff's subjective complaints.  Second, the ALJ erred in relying on a non-examining state agency physicians, Drs. Chambly and Voyten, to the extent that they contradicted Dr. Kontos' opinions.

A. THE ALJ'S RELIANCE ON DR. KONTOS' OPINIONS.

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight.  *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. § 404.1527(d)(2)).  "If the opinion of a treating source is not accorded controlling weight, an ALJ

must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir.2007)).  Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir.2007)).  Opinions of specialist with respect to the medical condition at issue are given more weight than a nonspecialist. *Johnson, supra*, (*citing* 20 C. F. R. § 404.1527(d)(5)).

The Commissioner has elected to impose certain standards on the treatment of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1502). Under one such standard, commonly called the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).

28

The Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion." *Id.* (c*iting* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (*citing* TILES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, SOC. SEC. RUL. (SSR) No. 96–2p, 1996 SSR LEXIS 9, at *12 (July 2, 1996)).  This requirement is not simply a formality; it is to safeguard the claimant's procedural rights.  *Id.*  It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not." *Id.* at 937-938 (*citing Wilson*, *supra*, 378 F.3d at 544).  Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule." *Id*. (*citing Wilson*, at 544–545).

In judging compliance with the treating source rule, the ALJ presumably considered Dr. Kontos' length of treatment, the frequency of examination, the nature and extent of his treatment relationship with Plaintiff, the support of his opinion afforded by the medical evidence of record and the consistency of his conclusion with the record as a whole.  Such considerations were critical to the decision that Dr. Kontos had an ongoing treatment relationship with Plaintiff with a frequency during the two year-relationship that was consistent with accepted medical practice for the type of treatment and/or evaluation required for Plaintiff's condition.  Dr. Kontos conducted clinical reviews of Plaintiff's symptoms primarily related to severe anxiety and depression working with diagnostic impressions apparently made by other physicians.  Dr. Kontos' standardized treatment notes

included observations of Plaintiff's appearance and affect, Plaintiff's appraisal of her levels of anxiety and depression and Plaintiff's assessment of her life stressors and Dr. Kontos review and arrangement of Plaintiff's medications based on Plaintiff's detailed characterizations of her symptoms (Docket No. 9, pp. 665-666, 686-688, 689-691, 692-694, 696, 700-704 of 707).  The ALJ attributed significant weight to Dr. Kontos' opinions that Plaintiff's prognosis was fair, a finding that was in contrast to Plaintiff's subjective complaint of a melancholic prognosis.  The ALJ relied on the medical records of Plaintiff's mental impairments as a whole, thus adhering to the treating physician rule.

The ALJ discredited Dr. Kontos' conclusion that Plaintiff's use of drugs was an attempt to medicate an underlying condition.  It is clear to any subsequent reviewer why the ALJ summarily rejected this conclusion:  Dr. Kontos failed to reconcile the maintenance of Plaintiff's mental impairments with her use of illicit drugs to protect herself from the psychological pain of her disorder or for recreational use.  Having found good cause to reject Dr. Kontos' unsupported conclusion that Plaintiff's use of drugs was a form of self-medication, the ALJ's analysis of Dr. Kontos' opinions is consistent with legal standards applicable for determining the weight to be given a treating physician's opinions (Docket No. 9, p. 45 of 707).

**B.**   **THE ALJ'S RELIANCE ON THE OPINIONS OF THE STATE AGENCY PSYCHOLOGICAL CONSULTANTS.**

Plaintiff suggests that the ALJ attributed too much weight to the opinions of the state agency physicians who only reviewed Plaintiff's records and treatment notes.  Yet the ALJ relied on the findings of Drs. Chambly and Voyten that Plaintiff was not psychiatrically disabled to the exclusion of critical conclusions by Dr. Kontos.

Plaintiff is correct:  the ALJ is not bound by any findings made by State agency medical

30

consultants.  However, because state agency medical consultants are highly qualified physicians with expertise in Social Security disability evaluation, the ALJ **must** consider their findings as opinion evidence, except for the ultimate determination about whether an individual is disabled.  20 C.F.R. § 404.1527(f)(2)(i) (Thomson Reuters 2012).  The opinions of State agency psychological consultants can be given weight only insofar as they are supported by evidence in the case record, considering such factors as supportability of the opinion in evidence including any evidence received at the ALJ and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.  POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, 1996 WL 374180, *2, SSR 96-6p (July 2, 1996).  In fact, SSR 96-6p states that an ALJ "may not ignore" the opinions of State agency medical and psychological consultants and "must explain the weight given to the opinions in their decisions." Unless the treating source's opinion is given controlling weight, the ALJ must explain in the decision the weight give to the opinions of State agency medical or psychological consultants just as the ALJ must do for any opinions from treating sources.  20 C. F. R. §§ 404.1527(e)(2)(ii) (Thomson Reuters 2012).

Because the treating source's opinion is given controlling weight to the extent that it was supported by objective medical evidence, the ALJ need not explain the weight given to the psychological consultants.  Instead, the ALJ referenced 20 C. F. R. §§ 404.1527, 416.927(f) and explained that the State agency psychological consultants opinions were considered during the initial

and reconsideration stages.  The ALJ did not attribute greater weight to the opinions of these consulting sources than to the opinions of Plaintiff's treating sources but adopted the State agency psychological consultant opinions to the extent that they were consistent with the treatment records. In fact, the scope of the ALJ's reliance on these opinions was limited to the mental health impairments of bipolar and generalized anxiety disorders, impairments confirmed by Dr. Kontos and CPS personnel (Docket No. 9, pp. 43, 44 of 707).

Plaintiff's second claim lacks merit because the Magistrate does not find that an inappropriate amount of weight was given to the State agency reports.

3.    THE CREDIBILITY FINDING.

Plaintiff asserts four bases for determining that the ALJ's credibility finding is deficient. First, the ALJ failed to consider that Plaintiff's failure to take her medication was a symptom of her psychotic disorders.  Second, the ALJ failed to consider Plaintiff's testimony of her limited capacity to engage in normal daily activities and her reliance on others to perform daily activities.  Third, the ALJ downplayed the significance of the GAF scores.  Fourth, the ALJ downplayed his observations of Plaintiff at the hearing.

It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 (6th Cir.2007) (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir.1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir.1990); *Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 538 (6th Cir.1981)).  However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (*citing* POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at * 4, SSR

32

96-7p, (July 2, 1996)).  Rather, such determinations must find support in the record.  *Id.*  Whenever

a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported

by objective medical evidence, the ALJ must make a determination of the credibility of the claimant

in connection with his or her complaints "based on a consideration of the entire case record."  *Id.*

The entire case record includes any medical signs and lab findings, the claimant's own

complaints of symptoms, any information provided by the treating physicians and others, as well

as any other relevant evidence contained in the record.  *Id*.  Consistency of the various pieces of

information contained in the record should be scrutinized.  *Id.*  Consistency between a claimant's

symptom complaints and the other evidence in the record tends to support the credibility of the

claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

*Id.* at 248.

SSR 96-7p also requires the ALJ explain the credibility determinations in his or her decision

such that it "must be sufficiently specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's statements and the reasons for that

weight."  *Id*. (footnote omitted).  In other words, blanket assertions that the claimant is not

believable will not pass muster, nor will explanations as to credibility which are not consistent with

the entire record and the weight of the relevant evidence.  *Id.*

The Magistrate notes that the ALJ found Plaintiff credible concerning the symptoms of panic

attack, racing thoughts, anxiety, not going outside alone, not doing chores, not being able to focus

and not going around people.  Plaintiff admitted that she stopped taking her medications.  She

claimed they were not working because the symptoms continued; however, she was continued to

drink to three beers to a six pack.  Later, Plaintiff discontinued her medications during another week

but in her opinion, her mood was somewhat better, she was less nervous and she was still moderately

33

anxious and in a panicked state.  In determining credibility, the ALJ was required to consider this evidence.  The Magistrate does not disturb his consideration of a fact that is supported by the evidence in the case record.

Similarly, the ALJ considered Plaintiff's testimony that she was limited in her ability to engage in daily activities.  However, the only evidence to substantiate this testimony of limited daily activities was the testimony itself.  In determining the credibility, it was imperative that the ALJ consider Plaintiff's statements about her symptoms and their functional effects.  The ALJ did consider Plaintiff's testimony of her limited abilities to perform daily activities.  The ALJ in fact found Plaintiff's testimony credible to the extent that he determined Plaintiff experienced moderate restrictions with respect to activities of daily living (Docket No. 9, pp. 38, 41 of 707).

Acknowledging that the ALJ is not required to discuss every piece of evidence, the ALJ did consider several of Plaintiff's GAF scores and their significance to the degree of limitations.  This evidence shows that the ALJ did not downplay the significance of Plaintiff's GAF scores (Docket No. 9, pp. 40, 44, 45 of 707).

It is more appropriate that Plaintiff's abrupt exit from the room prior to the testimony of the expert witnesses was relevant to the severity of her impairment, not her credibility.  Plaintiff had completed her testimony and in all likelihood, the ALJ had sufficient opportunity to observe Plaintiff's demeanor.  This credibility finding is therefore affirmed.

## VIII. CONCLUSION.

For these reasons, the Magistrate recommends that the Court affirm the Commissioner's decision denying SSI and DIB benefits, deny the Motion for Summary Judgment and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:    October 29, 2012

## IX.  NOTICE FOR REVIEW.

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.